**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
JO ANN PRESCOTT and PRESCOTT
COVERAGE, LLC,

                     Plaintiffs,           **REPORT AND RECOMMENDATION**

   -against-                       17-CV-6508 (ENV) (ST)

NATIONWIDE MUTUAL INSURANCE
COMPANY,

                     Defendant.
--------------------------------------------------------X

**TISCIONE, United States Magistrate Judge:**

Plaintiff Jo Ann Prescott ("Ms. Prescott") is an insurance agent who holds the rights to service certain policies owned by Defendant Nationwide Mutual Insurance Company ("Nationwide") in the Brooklyn area.[1] Ms. Prescott alleges that Nationwide fraudulently assigned those servicing rights to her in 2008 by concealing the existence of a lawsuit filed by the previous assignee of the servicing rights, Carlos Balcarcel ("Mr. Balcarcel").[2] On December 21, 2018, after the close of discovery, Nationwide filed a Motion for Summary Judgment as to Plaintiffs' sole claim of fraud, arguing that the claim is barred by the statute of limitations and is, in any case, without merit.[3] Nationwide subsequently filed a Motion for Sanctions against Plaintiffs and their counsel, citing Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent authority.[4] The District Court referred both motions to this Court to issue a Report and Recommendation.[5]

---

[1] Complaint ("Compl.") ¶¶ 13–14, ECF No. 1.
[2] Compl. ¶¶ 31–33.
[3] Memorandum in Support of Motion for Summary Judgment ("MSJ Memo"), ECF No. 34.
[4] Motion for Sanctions and Memorandum in Support ("Mot. Sanctions"), ECF No. 35.
[5] Order dated March 15, 2019.

For the reasons set forth below, the Court recommends that Defendant's Motion for Summary Judgment be granted and that Defendant's Motion for Sanctions be denied.

## BACKGROUND

I.    <u>Mr. Balcarcel's Purchase of the Servicing Rights and Subsequent Litigation</u>

At the center of the dispute in this case is a "servicing agreement" between Ms. Prescott and Nationwide. According to Nationwide, the company retains full ownership of its insurance policies, but enters into servicing agreements with insurance agents, who coordinate sales and renewals of policies to Nationwide's customers (i.e., they "service" the policies).[6] Under these servicing agreements, the agent generally pays a recurring fee to Nationwide, and in return Nationwide gives the agent the right to receive commissions from income generated through the policies serviced by the agent.[7]

In 2006, Mr. Balcarcel entered into one such servicing agreement with Nationwide, whereby he received the right to service and earn commissions from certain Nationwide policies in the Brooklyn, New York area.[8] In 2007, Nationwide enacted new so-called "coastal restrictions" in Brooklyn and other areas.[9] The coastal restrictions substantially prevented agents from issuing new housing and commercial property insurance policies in certain coastal areas of New York, including the area in Brooklyn serviced by Mr. Balcarcel.[10] Mr. Balcarcel believed that the coastal

---

[6] MSJ Memo at 3–4.
[7] *Id.*
[8] ECF No. 1-12 at 15–23. ECF No. 1-12 is Exhibit 10 to the Complaint in this action. It contains both the complaint filed by Mr. Balcarcel in the case *Balcarcel v. Nationwide Mut. Ins. Co.*, 08-CV-4233 (RJD) (RML) (E.D.N.Y. Oct. 17, 2008), and the exhibits that were attached to that complaint. The Court will cite relevant portions of Mr. Balcarcel's complaint as "Mr. Balcarcel's Complaint" followed by the paragraph number. The Court will cite the exhibits to Mr. Balcarcel's complaint simply as ECF No. 1-12, followed by the ECF-assigned page numbers.
[9] Mr. Balcarcel's Complaint ¶¶ 23–24.
[10] *Id.*

restrictions would significantly reduce the value of the servicing rights he had purchased.[11] Mr. Balcarcel terminated the servicing agreement with Nationwide effective April 18, 2008, in large part because of the newly imposed coastal restrictions.[12]

In October 2008, Mr. Balcarcel initiated an action against Nationwide in this District.[13] Mr. Balcarcel alleged that Nationwide fraudulently induced him to enter into the servicing agreement in 2006 by providing him a business plan and projections that showed "exponential growth" in the value of the homeowner and commercial property policies in the area, even though Nationwide allegedly knew at the time that its soon-to-be-imposed coastal restrictions would render those projections inaccurate.[14] In June 2010, Mr. Balcarcel's lawsuit settled without any admission of liability by Nationwide, and the complaint was dismissed with prejudice.[15]

## II.    Ms. Prescott's Purchase of the Servicing Rights

Around the time of Mr. Balcarcel's dispute with Nationwide over the effect of the coastal restrictions, Ms. Prescott was engaged in discussions with Nationwide representatives regarding the purchase of the same servicing rights held by Mr. Balcarcel. On January 4, 2008, Thomas J. Krolack ("Mr. Krolack"), a Nationwide District Manager responsible for Brooklyn, met with Ms. Prescott. He informed her that Mr. Balcarcel's servicing rights were expected to become available soon and offered her the opportunity to enter into a servicing agreement for the rights.[16] On April

---

[11] Defendant's Local Rule 56.1 Reply Statement of Facts ("Reply SOF") No. 7, ECF No. 34-13. Pursuant to Local Rule 56.1(c), each statement of fact contained in Defendant's original Local Rule 56.1 statement (ECF No. 34-1) is deemed admitted unless specifically controverted by Plaintiffs in the statement of facts submitted with their Opposition to the Motion for Summary Judgment. Herein, the Court references only the facts contained in Defendant's Reply Statement of Facts that are undisputed by Plaintiffs and thus deemed admitted.

[12] *Id.* Nos. 7–8; *see also* Exh. 7 to Compl. ("Mr. Balcarcel's Rescission Letter"), ECF No. 1-9.

[13] *See* Mr. Balcarcel's Complaint at 1.

[14] *Id.* ¶¶ 28–30. Mr. Balcarcel also alleged an alternative breach of contract cause of action. *Id.* ¶¶ 36–38.

[15] Reply SOF No. 8; Exh. 11 to Compl. ("*Balcarcel* Stipulation of Dismissal"), ECF No. 1-13.

[16] Compl. ¶ 16; Answer ¶ 16, ECF No. 6.

19, 2008, the day after Mr. Balcarcel terminated his servicing agreement, Ms. Prescott entered into an interim servicing agreement with Nationwide covering the same policies.[17] The terms of this interim servicing agreement provided what Nationwide refers to as a "free look period," meaning that Ms. Prescott had the right to service and receive commissions from the policies without being irrevocably committed to pay Nationwide a recurring fee for this right.[18]

Around the time Ms. Prescott entered into the interim service agreement, she had a phone call with Mr. Balcarcel to discuss his experience acting as the agent for the policies.[19] During that phone call, Mr. Balcarcel told Ms. Prescott that he had spoken to an attorney in connection with the termination of his servicing agreement with Nationwide.[20] According to an e-mail sent by Ms. Prescott on April 22, 2008, Mr. Balcarcel's attorney said that Nationwide had been "putting up roadblocks" to the transfer of the office phone number.[21] Referring to these "roadblocks," Ms. Prescott responded, "Not sure what that means but not my business."[22]

Ms. Prescott received another communication pertaining to Mr. Balcarcel's retention of counsel in connection with his termination of his servicing rights—an e-mail sent by a Director in Nationwide's Lease Administration division to a Nationwide Assistant General Counsel, which Mr. Krolack then forwarded to Ms. Prescott on May 28, 2008. This e-mail was part of a chain of several e-mails in which the Director had asked the Assistant General Counsel about the status of

---

[17] Reply SOF No. 1; Compl. ¶¶ 18–19.
[18] *See* Exh. 8 to Compl., ECF No. 1-10 ("Interim Servicing Agreement").
[19] Reply SOF No. 2.
[20] *Id*.
[21] *See* ECF No. 34-2 at 95. ECF No. 34-2 is Exhibit A to Defendant's Motion for Summary Judgment. Exhibit A consists of the transcript of the deposition of Ms. Prescott and also exhibits to her deposition. The Court will hereinafter refer to excerpts from Ms. Prescott's deposition transcript, contained at ECF-assigned page numbers 2–72 of ECF No. 34-2, as "Prescott Depo." followed by the internal page numbers of the deposition. When referring to any of the exhibits to the deposition transcript, the Court will simply cite "ECF No. 34-2" and include the ECF-assigned page number.
[22] *Id.*

Mr. Balcarcel's resignation as the agent servicing the Brooklyn policies, ostensibly so that Nationwide could take further steps to facilitate the transfer of the office lease to Ms. Prescott. Upon one request for a status update sent by the Director, the Assistant General Counsel responded:

> We made a final settlement offer to Balcarcel about a month ago and have been waiting for his counsel to advise us how he was going to proceed. It looked like litigation was an option, but we have not received a definitive response.[23]

Throughout most of this litigation, Ms. Prescott disputed that this e-mail was ever sent to her; when Nationwide produced a copy of the e-mail at her deposition for questioning, she accused Nationwide of having falsified it.[24] However, shortly after her deposition, she discovered that she had indeed received this e-mail, and she ultimately admitted as much.[25] Nonetheless, Ms. Prescott maintains that she did not read the e-mail and was unaware of its contents until it was presented by Nationwide in this litigation.[26]

On September 16, 2008, Ms. Prescott entered into the Policy and Service Agreement (the "PASA") for the Brooklyn policies.[27] This agreement essentially formalized the terms of the interim servicing agreement and required Ms. Prescott to pay a recurring fee in exchange for Nationwide's assignment of the servicing rights.[28] By the time she signed the PASA, Ms. Prescott was aware of the coastal restrictions put into effect by Nationwide in 2007.[29]

The value of the servicing rights purchased by Ms. Prescott declined precipitously. By the fourth quarter of 2008, the rights had declined in value by 37.5%, a decrease of roughly

---

[23] ECF No. 34-2 at 141.
[24] Prescott Depo. at 348:11–348:12, 357:6–357:7; *see also* Mot. Sanctions at 2.
[25] Plaintiffs' Response to Request for Admission No. 7, Exh. B. to Mot. for Summary Judgment, ECF No. 34-3.
[26] Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Opp'n") at 10, ECF No. 34-4.
[27] Exh. 9 to Compl., ECF No. 1-11.
[28] *Id.*
[29] Reply SOF No. 10; Prescott Depo. at 54:7–19.

$328,000.[30] By May of 2011, that decline reached 70%, a decrease of roughly $700,000.[31] At that point, Ms. Prescott wrote an e-mail to a Nationwide representative asking that the terms of the PASA be modified such that, essentially, she would pay Nationwide less for these servicing rights, which turned out to be much less valuable than she had anticipated.[32] This led to a chain of e-mails in which Ms. Prescott, in support of her request for more compensation, identified a number of potential factors for the decline of the value of the servicing rights.[33] One of the potential factors she identified was Mr. Balcarcel's apparently abrupt and negative termination of his servicing agreement, which she termed a "hostile agent resignation."[34] In response to her complaints, Nationwide provided a consultant to discuss the decline in the value of the servicing rights with Ms. Prescott and provide suggestions for a reversal of the business's fortunes, but did not provide the additional compensation Ms. Prescott requested.[35]

According to Ms. Prescott, she did not learn of the lawsuit Mr. Balcarcel filed against Nationwide in this District, or that he had contemplated filing such a lawsuit, until February of 2016.[36] In November of 2016, Ms. Prescott, by and through her attorney William P. Tedards, Jr., Esq. ("Mr. Tedards"), sent a demand letter to Nationwide's general counsel threatening to file a lawsuit similar to the one Mr. Balcarcel filed if Nationwide did not re-price Ms. Prescott's servicing agreement.[37]

III.    The Instant Litigation

---

[30] Reply SOF No. 9; ECF No. 34-2 at 135.
[31] Reply SOF No. 13.
[32] ECF No. 34-2 at 133; Reply SOF No. 12.
[33] ECF No. 34-2 at 133.
[34] *Id.*
[35] Compl. ¶ 3; MSJ Memo at 8.
[36] Compl. ¶ 28; Prescott Depo. at 89:20–90:3.
The record does not indicate how Ms. Prescott ultimately came to be aware of Mr. Balcarcel's lawsuit.
[37] Exh. 1 to Compl. ("Demand Letter") at 2, ECF No. 1-3.

Nationwide still did not agree to re-price the servicing rights assigned to Ms. Prescott as she requested in her demand letters, and Plaintiffs filed the Complaint in this action on November 8, 2017.[38] The Complaint contains one count of fraud in the inducement.[39] The basis for the fraud claim is that Nationwide allegedly "concealed and failed to disclose" that:

> (a) the business was the subject of a federal litigation focusing on fraudulent inducement to purchase a non-viable business; (b) the record in the litigation contained Nationwide's own internal projection in 2007 that showed a non-viable declining business; and (c) the business became available only because Mr. Balcarcel had unilaterally tendered the business back to Nationwide in April of 2008 because it was not viable.[40]

Notably, as both parties acknowledge in their briefing, Plaintiffs' claim does not rely on the same facts as Mr. Balcarcel did in his own lawsuit.[41] Mr. Balcarcel's allegation of fraud was based on Nationwide's concealment of the coastal restrictions and provision of an overly optimistic financial projection that the company knew would be invalidated in short order by the rollout of these restrictions.[42] Here, Plaintiffs also allege fraud, but that allegation is not based in any way on the coastal restrictions, of which Ms. Prescott admits she was aware.[43] Rather, Plaintiffs allege that Nationwide committed fraud by concealing the fact that Mr. Balcarcel had made unrelated claims of fraud that eventually resulted in litigation.[44] Plaintiffs seem to argue that Nationwide had a duty to inform Ms. Prescott both that Mr. Balcarcel was contemplating filing litigation against Nationwide prior to Ms. Prescott's execution of the servicing agreement, and that he eventually

---

[38] Compl. at 1.

[39] Compl. ¶¶ 31–33.

[40] Compl. ¶ 31.

[41] Opp'n at 15; Defendant's Reply Memorandum in Support of Summary Judgment ("Reply") at 7, ECF No. 34-12.

[42] Mr. Balcarcel's Complaint ¶¶ 23–35.

[43] *See* Opp'n at 15.

[44] *Id*.

did in fact file the lawsuit.[45] Nationwide's concealment of these facts, Plaintiffs argue, led to Ms. Prescott's "reasonable assumption that [the servicing rights were] a normal ongoing concern."[46]

Nationwide timely answered the Complaint on December 22, 2017.[47] The Court held an initial conference on February 22, 2018, at which it issued a scheduling order directing the parties to complete fact discovery by October 15, 2018.[48] On April 16, 2018, Defendant filed a fully briefed Motion for Judgment on the Pleadings, which the District Court denied as moot when it allowed Defendant to seek summary judgment.[49] Defendant filed its fully-briefed Motion for Summary Judgment February 5, 2019.[50] With leave from the District Court, Defendant also filed a fully-briefed Motion for Sanctions on March 15, 2019.[51] The Honorable Eric N. Vitaliano referred both the Motion for Summary Judgment and the Motion for Sanctions to this Court to issue a Report and Recommendation on March 15, 2019.[52]

## DISCUSSION

The Court will discuss, in turn, Defendant's (1) Motion for Summary Judgment and (2) Motion for Sanctions.

---

[45] Opp'n at 26 ("Nationwide's statement that 'almost nothing occurred in the Balcarcel lawsuit['] does not address the concealment that occurred in the period between November 27, 2007 and September 17, 2008, leading up to the execution of the PASA.").
In this Report and Recommendation, the Court's discussion of Nationwide's nondisclosure of the lawsuit filed by Mr. Balcarcel also refers to Nationwide's nondisclosure of Mr. Balcarcel's threats of litigation or pre-litigation disputes with Nationwide, both for ease of reference and because there is no legally relevant distinction between Nationwide's nondisclosure of the lawsuit and its nondisclosure of Mr. Balcarcel's pre-litigation disputes with Nationwide.
[46] Compl. ¶ 32.
[47] Answer, ECF No. 6.
[48] Minute Entry, ECF No. 14.
[49] ECF No. 26; Order dated November 21, 2018.
[50] ECF No. 34.
[51] ECF No. 35.
[52] Order dated March 15, 2019.

I.    <u>Motion for Summary Judgment</u>

Defendant moves for summary judgment against Plaintiffs on two asserted grounds: (1) the statute of limitations applicable to fraud actions bars Plaintiffs' claims, and (2) Plaintiffs cannot prove their claim of fraudulent concealment on the merits.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[53] The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."[54] Once "such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'"[55]

A "fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" and an "issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[56] "'Summary judgment is not a substitute for a trial,' and so if 'the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief,' summary judgment should be denied."[57] When determining whether a genuine issue of fact exists on summary judgment, "'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'"[58]

---

[53] Fed. R. Civ. P. 56(a).
[54] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[55] *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).
[56] *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (quoting *Anderson*, 477 U.S. at 248).
[57] *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (brackets omitted)), *cert. denied*, 139 S. Ct. 1375, 203 L. Ed. 2d 609 (2019).
[58] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted); *accord Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

Nonetheless, a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because mere "conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."[59] If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" then the Court must enter summary judgment.[60]

A. *Statute of Limitations*

Defendant argues that Ms. Prescott had constructive knowledge of the Balcarcel dispute more than 2 years prior to the filing of the Complaint in this action on November 8, 2017, and that the Complaint was thus untimely. For the reasons set forth below, the Court disagrees.

(i)    *Standard*

"Under New York law, a claim for fraud must be commenced either within six years from the commission of the fraud or within two years from the date that the fraud was discovered, or could reasonably have been discovered, whichever is later."[61] Given that more than six years passed between the alleged fraud in 2008 and the filing of this action in 2017, the question at issue here is whether Plaintiffs could reasonably have discovered the facts which they claim Nationwide concealed more than two years prior to the commencement of this action. This determination is referred to as whether the plaintiff was on "inquiry notice" of the fraud.[62]

Under the inquiry notice standard for fraud, "[t]he two-year [limitations] period begins to run when the circumstances reasonably would suggest to the plaintiff that he or she may have been

---

[59] *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

[60] *Celotex*, 477 U.S. at 322.

[61] *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007) (footnote omitted) (citing, *inter alia*, N.Y. C.P.L.R. § 213(8)).

[62] *See Aozora Bank, Ltd. v. Deutsche Bank Sec. Inc.*, 137 A.D.3d 685, 689, 29 N.Y.S.3d 10, 14 (1st Dep't 2016).

defrauded, so as to trigger a duty to inquire on his or her part."[63]  "[A] duty to inquire is triggered by information that 'relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'"[64]

The inquiry notice standard is an objective one.[65] As such, plaintiffs will be on inquiry notice not only when they are subjectively aware of facts which may constitute a fraud, but when they are "possessed of knowledge of facts from which the fraud could be reasonably inferred."[66] It is not necessary that one source of notice be independently sufficient to have put plaintiffs on inquiry notice of the facts underlying their claim; "[r]ather, a totality-of-the-circumstances analysis applies,"[67] and all of the relevant evidence is assessed as a whole.

Nonetheless, whether a plaintiff had a duty to inquire into the possible existence of a fraud is "a mixed question of law and fact which should not be resolved summarily unless it conclusively appears that the plaintiff had knowledge of facts which should have caused him or her to inquire and discover the alleged fraud[.]"[68] As such, "a defendant seeking summary judgment based on a plaintiff's failure to timely discover fraud faces considerable hurdles, since the moving party bears the burden of demonstrating the absence of a genuine issue of material fact[.]"[69]

---

[63] *Shalik v. Hewlett Assocs., L.P.*, 93 A.D.3d 777, 778, 940 N.Y.S.2d 304, 305 (2d Dep't 2012).

[64] *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) (quoting *Newman v. Warnaco Grp.*, 335 F.3d 187, 193 (2d Cir. 2003)).

[65] *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) (citing *Warner v. Republic Steel Corp.,* 103 F. Supp. 998, 1009 (S.D.N.Y. 1952)).

[66] *Williams-Guillaume v. Bank of Am., N.A.*, 130 A.D.3d 1016, 1017, 14 N.Y.S.3d 466, 468 (2d Dep't 2015) (brackets, internal quotation marks, and citation omitted).

[67] *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008)

[68] *Soghanalian v. Young*, 131 A.D.3d 744, 745, 14 N.Y.S.3d 585, 587 (3d Dep't 2015) (internal quotation marks and citations omitted).

[69] *Abele Tractor & Equip. Co. v. Balfour*, 133 A.D.3d 1171, 1173, 20 N.Y.S.3d 697, 700 (3d Dep't 2015) (brackets, ellipses, internal quotation marks, and citation omitted).

(ii)    *Discussion*

The only fraud that Plaintiffs allege in their Complaint is Nationwide's failure to disclose the litigation that was threatened and ultimately filed by Mr. Balcarcel.[70] Thus, the proper inquiry as to the statute of limitations is whether Plaintiffs were possessed of facts sufficient to prompt a reasonable person to investigate whether Mr. Balcarcel had threatened or filed litigation against Nationwide in connection with his termination. Construing all the evidence in the light most favorable to Plaintiffs, the Court concludes that this question remains subject to genuine dispute.

Nationwide has identified several items of evidence that it calls "inquiry notice triggers."[71] If a reasonable insurance agent had been confronted with any of this evidence, Nationwide argues, she would have investigated further to determine whether Mr. Balcarcel had filed or threatened litigation in connection with the termination of his servicing agreement. The Court will discuss this evidence in turn below.

1. *May 28, 2008 E-mail*

The first "inquiry notice trigger" proposed by Nationwide is the e-mail from the Nationwide Assistant General Counsel that was forwarded to Ms. Prescott on May 28, 2008.[72] Nationwide devotes a considerable portion of its briefing to this e-mail, repeatedly asserting that it is dispositive of Plaintiffs' case. Nationwide submits that because this e-mail explicitly referenced the possibility of litigation by Mr. Balcarcel, it does not matter whether or not Ms. Prescott read the e-mail, or even whether a failure to have read the e-mail would be reasonable under the circumstances.

---

[70] Compl. ¶¶ 31–33.
[71] *See* Reply at 6–16.
[72] *Id*. at 6–9.

- 12 -

Plaintiffs dispute that the e-mail is dispositive. Although they acknowledge that Ms. Prescott did receive the e-mail on May 28, 2008, they insist that she had not read it until Nationwide confronted her with it at her deposition, and that she did not realize that the e-mail had made it to her inbox until conducting a further search of her e-mails after the deposition.[73] Plaintiffs argue that it was reasonable for Ms. Prescott not to have read the e-mail because it was contained at the end of a chain of e-mails that Mr. Krolack forwarded to her in response to her inquiry into the transfer of the lease for Mr. Balcarcel's previous office.[74]

As such, the core of the party's dispute about the relevance of the May 28, 2008 e-mail is not so much a factual question as a legal one: can a party ever avoid the constructive notice effect of a document in her possession on the basis that her failure to read the document was reasonable? Nationwide answers this question in the negative. It supports its position, in its Reply brief, by citing one Summary Order issued by the Second Circuit, two brief affirmances by the Appellate Division of the First Department of the State of New York, and one unpublished decision of the Supreme Court of New York for New York County.[75] Nationwide purports that these cases show, unequivocally, that a plaintiff will have been held to have knowledge of the contents of any document in her possession for purposes of determining whether she was on inquiry notice of the alleged fraud.[76] The Court agrees that, if this were the rule, Ms. Prescott would have been put on inquiry notice by the e-mail, because she received it and because it plainly references the possibility of litigation filed by Mr. Balcarcel.

---

[73] Opp'n at 10–14.

[74] *Id.* at 14.

[75] *See* Reply at 7–8, ECF No. 34-12 (citing *Std. Sec. Life Ins. Co. of New York v. Berard*, 684 F. App'x 56, 58–59 (2d Cir. 2017); *Spinale v. Tag's Pride Produce Corp.*, 44 A.D.3d 570, 571, 844 N.Y.S.2d 255, 256 (1st Dep't 2007); *Rite Aid Corp. v. Grass*, 48 A.D.3d 363, 364, 854 N.Y.S.2d 1 (1st Dep't 2008); *Leider v Amalgamated Dwellings, Inc.*, No. 111506/07, 2009 WL 2984839 (N.Y. Sup. Ct. Sept. 9, 2009)).

[76] *Id.* at 7–9.

However, Nationwide's proffer of an absolute rule that a party will be deemed to have knowledge of any document in its possession is unconvincing. The ultimate question of whether a plaintiff was on inquiry notice of a fraud turns on the reasonableness of the plaintiff's investigation, or lack thereof, into the circumstances that she now claims constitute fraud. Thus, context is key.

Nationwide does not account for the type of document that Ms. Prescott failed to read or the context in which she received it. The e-mail that was sent to her on May 28, 2008 was included at the end of a chain of nine e-mails exchanged between a Nationwide Director of Leasing and an Assistant General Counsel. The primary topic of the e-mail chain was whether Mr. Balcarcel had vacated his office, not the broader circumstances of his termination of his servicing agreement with Nationwide.

By contrast, the cases cited by Nationwide that attribute constructive knowledge of the contents of the documents to the plaintiffs all involve documents that are key to the transactions the plaintiffs later claimed to be fraudulent. The case that Nationwide relies most heavily on in its Reply brief is *Standard Security Life Insurance Company of New York v. Berard*, a Summary Order issued by the Second Circuit.[77] In that case, a former professional hockey player, appealing the district court's order denying his counterclaim on summary judgment, argued that the insurance company appellee fraudulently induced him to enter into agreements to repay part of an award he received pursuant to his insurance policy.[78] He claimed that the appellee inaccurately represented to him that he would have been required to make such repayments under the original policy, regardless of whether he signed the repayment agreements.[79] The Second Circuit readily found that because the appellant had possession of the insurance policy and the repayment agreements,

---

[77] 684 Fed. App'x 56 (2d Cir. 2017) (cited in Reply at 2, 7–9, 17, 21, 26).
[78] *Id.* at 58.
[79] *Id.* at 58–59.

- 14 -

both of which he signed, more than two years prior to asserting his counterclaim, he had constructive knowledge of the terms of those agreements.[80] It held that "[n]o different conclusion is warranted by the assertion that Berard was simply not aware of the facts within his possession."[81]

Leaving aside that this decision is a non-precedential Summary Order, the facts in *Berard* are clearly much more decisive on the question of inquiry notice than those in the instant case. The information which Berard claimed he could not have discovered was contained in his insurance policy, the fundamental document governing his transaction with the appellee. Here, the information was contained in the final e-mail of an otherwise largely irrelevant chain. It is obvious that a sophisticated party cannot avoid the effect of a contract merely by claiming not to have read or understood its terms. The Court, however, does not find in *Berard* a categorical proposition that a party will be deemed to have gleaned every piece of information from any document in her possession for purposes of determining whether she was on inquiry notice of a fraud.

Nor does the Court find this proposition in any of the other cases cited by Nationwide. In *Spinale v. Tag's Pride Produce Corp.*, a two paragraph summary opinion, the First Department held that the allegedly fraudulently concealed facts were contained in Defendant's Schedule K-1 tax forms, which again are clearly more fundamental to the transaction than the e-mail chain that Mr. Krolack sent to Ms. Prescott.[82] In *Rite Aid Corp. v. Grass*, the First Department provided less description, stating only that "financial records and internal company correspondence" contained the allegedly concealed information.[83] However, the opinion at no point suggests the absolute

---

[80] *Id.* at 59.
[81] *Id.* (citing *Sheth v. N.Y. Life Ins. Co.*, 308 A.D.2d 387, 387, 764 N.Y.S.2d 414, 415 (1st Dep't 2003) (stating that "the contracts signed by plaintiffs at the time of their hiring, had they been read by plaintiffs as they could have been, would have clearly apprised them" of provisions they alleged were fraudulently concealed).
[82] 44 A.D. 570, 571 (1st Dep't 2003).
[83] 48 A.D.3d 363, 364 (1st Dep't 2008).

- 15 -

formulation propounded by Defendants. The final case cited by Nationwide, *Leider v. Amalgamated Dwellings, Inc.*, actually cuts against its proposition.[84] In that case, the court stated that "it has been *generally* held that when the documents necessary for a claimant to discover the alleged fraud were in his possession, the discovery exception does not apply.[85] If the rule that a plaintiff will be deemed to have read documents in her possession is merely *general*, rather than absolute as Nationwide argues, then the circumstances of this case leave open a genuine question of whether it was reasonable for Ms. Prescott to have remained unaware of the May 28, 2008 e-mail until after she commenced this litigation.

On a motion for summary judgment, the movant is not only required to show that there is no genuine dispute of material fact, but that those undisputed facts establish the movant's right to judgment in their favor as a matter of law.[86] Although the parties no longer appear to dispute that Ms. Prescott received the May 28, 2008 e-mail, Nationwide has not provided the Court with law that supports the proposition that, beyond any genuine dispute, Ms. Prescott had constructive knowledge of the e-mail's contents at the time she received it. Therefore, it has not met its burden to receive summary judgment based on the alleged inquiry notice effect of the May 28, 2008 e-mail.

### 2. *Public Filing of Mr. Balcarcel's Lawsuit*

Next, Nationwide argues that the fact that Mr. Balcarcel's lawsuit was filed publicly means that Ms. Prescott cannot reasonably claim she was unaware of it.[87] Again, as in its discussion of the May 28, 2008 e-mail, Nationwide asserts this proposition in absolute fashion: if information is contained in a document that is in the public domain, the plaintiff will be held to have been

---

[84] Index No. 111506/07, 2009 NY Slip Op 32080(U) (Sup. Ct. Sept. 9, 2009) (emphasis added).
[85] *Id.* ¶ 14.
[86] Fed. R. Civ. P. 56(a).
[87] Reply at 9–12.

constructively aware of that document. But whereas Nationwide's absolute statement of the law with respect to documents in a plaintiff's possession is simply insufficiently supported, with respect to documents in the public domain, it is flatly incorrect.

The inquiry notice effect of publicly available documents, including lawsuits, is a decidedly general, fact-intensive question. "[T]here is an inherent sliding scale in assessing whether inquiry notice was triggered by information in the public domain: the more widespread and prominent the public information disclosing the facts underlying the fraud, the more accessible this information is to plaintiff, and the less company-specific the information must be."[88] Lawsuits may be sufficient to put a plaintiff on inquiry notice, but that proposition is strongest when they are "widely publicized suits based on the exact same conduct."[89] Ultimately, the standard for determining whether public lawsuits put the plaintiff on inquiry notice is the same as the general standard for inquiry notice: whether the lawsuits "suggest to a person of ordinary intelligence the probability that he has been defrauded."[90]

Here, although Mr. Balcarcel's lawsuit was filed publicly, there is no evidence that it was publicized in any way. Nationwide cites a case for the proposition that "public reports of and lawsuits alleging fraud 'are sufficient to put a plaintiff on inquiry notice of fraud.'"[91] It does not follow from this statement, though, that the public filing of any lawsuit will mean that the plaintiff

---

[88] *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 128 (E.D.N.Y. 2013) (quoting *Staehr*, 547 F.3d at 432).

[89] *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 375 n.5 (E.D.N.Y. 2012); *see also Norddeutsche Landesbank Girozentrale v. Tilton*, 149 A.D.3d 152, 161, 48 N.Y.S.3d 98, 104 (1st Dep't 2017) ("[W]e are aware of no authority placing the onus on an investor to monitor all court proceedings concerning its investments, especially where there is otherwise no 'wealth of public information that should have put it on inquiry notice of the alleged fraud.'" (quoting *Aozora Bank, Ltd.,* 137 A.D.3d at 689)).

[90] *CIFG Assur. N. Am., Inc. v. Credit Suisse Sec. (USA) LLC,* 128 A.D.3d 607, 608, 11 N.Y.S.3d 563 (1st Dep't 2015) (internal quotation marks and citation omitted).

[91] *Sejin Precision Indus. Co. v. Citibank, N.A.*, 726 F. App'x 27, 30 (2d Cir. 2018) (quoting *Aozora Bank, Ltd.,* 137 A.D.3d at 689) (cited in MSJ Memo at 10).

was on inquiry notice of the lawsuit or the claims contained in it; that reading would ignore the phrase "public reports of" entirely. The better reading is that when public reports of fraud *and* lawsuits alleging fraud both exist, the plaintiff is likely to have been put on inquiry notice of the fraud.[92] In this case, the apparent lack of any kind of publicization of Mr. Balcarcel's lawsuit, or the claims he made in his lawsuit, makes dubious the assertion that Ms. Prescott should have been aware of it. At the very least, this leaves a question for the factfinder.

### 3. *Evidence of Losses*

Nationwide next argues that the losses in value of the servicing rights held by Ms. Prescott put her on inquiry notice of her fraud claim.[93]

New York courts have held that significant losses to a business can contribute to finding that a plaintiff was on inquiry notice of a fraud.[94] Here, the loss in value of the servicing rights after Ms. Prescott bought them appears stark. By the fourth quarter of 2008, less than a year after Ms. Prescott signed the interim servicing agreement, their value had declined by 37.5%.[95] By 2011, they were worth only 30% of what they had been when Ms. Prescott purchased them, a decrease of approximately $700,000.[96] Ms. Prescott was aware of these losses as they occurred.[97]

However, Nationwide has clearly failed to meet its burden to show that these losses created inquiry notice for Plaintiffs. Two of the three cases Nationwide cites in its briefing do not support

---

[92] The phrase "are sufficient," construed literally, could be taken to mean that any lawsuit that receives some kind of public coverage or that coincides with other public reporting of the alleged fraud will, invariably, put plaintiffs on inquiry notice of their fraud claim. However, the caselaw clearly reflects that this inquiry is circumstance-dependent. *See, e.g.*, *Staehr*, 547 F.3d at 427–436 (undertaking extensive analysis of whether various documents in the public domain put various investors on inquiry notice of their fraud claims).

[93] Reply at 12–13.

[94] *See Aozora Bank, Ltd.*, 137 A.D.3d at 689 (citation omitted).

[95] Reply SOF No. 9.

[96] Reply SOF No. 5.

[97] Reply SOF No. 12.

its proposition at all: they do not even discuss losses to the businesses.[98] The remaining case only states that "evidence of losses may put plaintiffs on inquiry notice."[99]

The argument that the decline in value of Ms. Prescott's servicing rights put her on inquiry notice of Mr. Balcarcel's lawsuit appears weak. This rule can be straightforwardly applied in a securities case, like the *Sejin* case cited by Nationwide, where the unraveling of a fraudulent scheme is likely to coincide with a precipitous decline in the value of the investment. Here, though, the causal connection between Mr. Balcarcel's filing of a lawsuit and the decline of the value of the servicing rights is far from clear. Indeed, as discussed further in Section I.B.iii below, both parties seem to agree that Mr. Balcarcel's filing of suit is not actually the cause of the losses to the value of Ms. Prescott's servicing rights. If the losses are at all related to Mr. Balcarcel's lawsuit, the extent to which those losses would have put a person of ordinary intelligence on inquiry notice of the lawsuit is a question for the factfinder.

### 4. *Remaining Evidence*

Nationwide's remaining evidence and arguments do not conclusively establish that Ms. Prescott was on inquiry notice, either.

Nationwide argues that the e-mail sent by Ms. Prescott to Nationwide in 2011, in which she requested that Nationwide compensate her for what she deemed deficiencies in the economic viability of the servicing rights, shows that she should have investigated further into Mr. Balcarcel's lawsuit.[100] This argument seems fundamentally similar to Nationwide's argument that the losses in the value of the servicing rights put Ms. Prescott on inquiry notice. But the fact that

---

[98] *See* Reply at 13 (citing *Yesa LLC v. RMT Howard Beach Donuts, Inc.*, 222 F. Supp. 3d 181, 189–191 (E.D.N.Y. 2016) and *Ayers v. Piaker & Lyons, P.C.*, No. 17-3513, 2018 WL 4224330, at *2–3 (2d Cir. 2018)).

[99] *Sejin Precision Indus. Co.*, 726 F. App'x at 30 (citing *Aozora Bank, Ltd.*, 29 N.Y.S.3d at 14).

[100] Reply at 13–15.

Ms. Prescott raised certain perceived issues with the viability of the servicing rights does not mean that she had a duty to investigate every potential issue. Besides the fact that she referred to Mr. Balcarcel's departure as a "hostile agent resignation," the "viability" issues she raised in this e-mail were entirely unrelated to Mr. Balcarcel. This e-mail does not constitute definitive evidence of inquiry notice.

Nationwide's final proposed "inquiry notice trigger" is Plaintiffs' new claim, in their Opposition to Summary Judgment, that "Ms. Prescott learned exactly what was wrong with the business in 2012, and it had nothing to do with Mr. Balcarcel."[101] What Ms. Prescott supposedly learned in 2012 is that Nationwide was engaging in redlining practices in the Brooklyn area that decreased the value of the servicing rights. The Court addresses this novel argument by Plaintiffs in Section I.B.i below. Suffice it to say that for purposes of inquiry notice, Nationwide must show that Plaintiffs had constructive knowledge of the fraudulent omission they allege in their *Complaint*—the nondisclosure of Mr. Balcarcel's suit—which Plaintiffs, despite their new redlining theory, appear to maintain was also a fraud at the summary judgment stage. The fact that Ms. Prescott identified this alleged redlining as a separate problem with the business in 2012 (or so Plaintiffs now claim) did not definitively create a duty for her to inquire into the existence of Mr. Balcarcel's lawsuit, because his lawsuit was not at all related to the alleged redlining.

Finally, although they do not propose it as an "inquiry notice trigger," Nationwide also suggests repeatedly that Ms. Prescott's phone conversation with Mr. Balcarcel in April of 2008 contributed to a duty of inquiry into whether he filed litigation against Nationwide.[102] During this call, which occurred around the time Ms. Prescott signed the interim servicing agreement, Mr. Balcarcel indicated that he was discussing the termination of his servicing agreement with an

---

[101] Opp'n at 2 (discussed in Reply at 15–16).
[102] MSJ Memo at 21, 25; Reply at 2, 33; *see also* Opp'n at 7–9.

attorney, and that the attorney had told him that Nationwide was "putting up roadblocks" to the transfer of the office phone number. Ms. Prescott apparently never spoke directly to Mr. Balcarcel again after this call and did not attempt to find out why he had been in touch with an attorney.

The Court finds that there is a genuine question as to whether Ms. Prescott should have investigated further into Mr. Balcarcel's dispute with Nationwide based on this phone call. There are many reasons to speak to an attorney, many of which do not involve litigation. Here, the only issue that Mr. Balcarcel mentioned to Ms. Prescott was the transfer of the office phone number, which the Court cannot construe as a definitive signal that Mr. Balcarcel was contemplating litigation. Moreover, Mr. Balcarcel did not actually initiate litigation until roughly six months after the call. Indeed, it is not even clear that he indicated on this phone call that he had retained an attorney, rather than merely having spoken to one. This phone call with Mr. Balcarcel, by itself, is clearly too slender a reed to support a finding that Ms. Prescott was on inquiry notice of the lawsuit.

For these reasons, a genuine question remains as to whether Plaintiffs were put on inquiry notice of Mr. Balcarcel's lawsuit more than two years prior to the initiation of this action.

B. *Merits*

Although Nationwide has not shown that it is entitled to summary judgment based on the statute of limitations, Nationwide has shown, as a matter of law, that Plaintiffs' fraud claim is without merit.

    (i)    *Plaintiffs Cannot Present a New Account of Fraud at the Summary Judgment Stage*

As discussed, Plaintiffs' Complaint contains only one claim of fraud.[103] The sole basis for this fraud claim is Nationwide's failure to disclose the fact that Mr. Balcarcel filed or was planning

---

[103] Compl. ¶¶ 31–33

to file litigation alleging fraud against it.[104] The entirety of the Complaint's facts section discusses Mr. Balcarcel's termination of his servicing agreement because of the coastal restrictions, his eventual suit against Nationwide, and Ms. Prescott's purchase of the servicing rights without knowledge of Mr. Balcarcel's dispute with Nationwide.[105]

In their Opposition to Defendant's Motion for Summary Judgment, Plaintiffs do re-allege, at certain points, the Complaint's assertion that the concealment of Mr. Balcarcel's litigation constituted a fraud.[106] However, Plaintiffs also devote a substantial portion of their brief to advancing a new claim of fraud against Nationwide—one that is entirely unrelated to Mr. Balcarcel's lawsuit.[107] Namely, Plaintiffs argue that Nationwide defrauded them by engaging in redlining and using other "discriminatory tactics" to prevent the sale of auto insurance to low income prospective insureds in Brooklyn.[108] Plaintiffs assert that these sales practices rendered Ms. Prescott's servicing rights "non-viable" because most of the clientele in the area are low income.[109] Plaintiffs seem to suggest that this redlining amounts to a fraud against Ms. Prescott because Nationwide entered into a consent decree with the Department of Justice from the years 1997 to 2003, pursuant to which it agreed not to engage in discriminatory sales practices.[110]

The Court need not address the merits of Plaintiffs' allegations of redlining, because it is clear that these allegations have nothing to do with Mr. Balcarcel's lawsuit against Nationwide.

---

[104] *Id.*

[105] *See id.* ¶¶ 15–30.

[106] *See, e.g.*, Opp'n at 5 ("Nationwide is attempting to apply a *caveat emptor* standard to a transaction where, as it induced one of its trusted career agents to purchase a business which it knew was headed for litigation, it had a duty to disclose the true facts and circumstances under which the business had become available.") (emphasis removed).

[107] *See* Opp'n at 16–22 (captioned "The 'Viability' Issue: Nationwide Does Not Want the Clientele Served by This Agency").

[108] *Id.*

[109] *Id.* at 22.

[110] *Id.* at 16–18, 21–22.

Plaintiffs themselves acknowledge the irrelevance of the alleged redlining to the concealment of Mr. Balcarcel's lawsuit, writing that "Ms. Prescott learned exactly what was wrong with the business in 2012, and it had nothing to do with Mr. Balcarcel."[111] But they also seem to forget that the concealment of Mr. Balcarcel's lawsuit is the entire basis of their own case.

"Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense."[112] Because a plaintiff's failure to assert a claim before the summary judgment stage will inevitably prejudice the defendant, courts in this Circuit have consistently ruled that it is "inappropriate to raise new claims for the first time in submissions in opposition to summary judgment."[113]

In this case, Plaintiffs' Complaint, which only discussed the nondisclosure of Mr. Balcarcel's lawsuit, clearly did not give Defendant any notice allowing it to prepare a defense to the claim that its alleged redlining somehow constituted a fraud against Plaintiffs. To the extent that Plaintiffs only discovered facts supporting their redlining theory during discovery, they had a clear path to validly asserting this claim: they could have sought leave to amend their complaint.[114] Waiting until summary judgment present the claim is not a valid alternative.

Properly disregarding this claim of redlining, the Court will turn to the merits of Plaintiffs' claim that Nationwide fraudulently concealed Mr. Balcarcel's lawsuit from Ms. Prescott.

---

[111] *Id.* at 5.
[112] *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 406 (S.D.N.Y. 2006).
[113] *Id.* at 406–07 (quoting *Beckman v. United States Postal Serv.*, 79 F. Supp. 2d 394, 408 (S.D.N.Y. 2000)); *see also Brown v. Magistro*, No. 10-CV-3705 (CS) (PED), 2011 WL 6399514, at *3 (S.D.N.Y. Dec. 20, 2011) ("[I]t is well settled that a Court should not on summary judgment consider factual allegations and legal theories not raised in the complaint.").
[114] *See Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)).

(ii)    *Elements of Fraudulent Concealment*

Under New York state common law, a party may be liable for fraud either by misrepresentation or by omission; the latter is referred to as "fraudulent concealment."[115] To prevail on any claim of fraud, the plaintiff is required to show that the defendant made: "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] [] for the purpose of inducing the [plaintiff] to rely upon it, [3] justifiable reliance [by] the [plaintiff] on the [] material omission, and [4] injury."[116] In addition, to prevail on a claim of fraudulent concealment, the plaintiff is required to establish that the defendant had a duty to disclose the information it omitted.[117]

Preliminarily, Plaintiffs' Complaint captions its sole cause of action "Fraud in the Inducement," seemingly suggesting that Nationwide made affirmative misrepresentations to Plaintiffs.[118] Yet, as Nationwide points out,[119] the substance of the allegations supporting this claim is that Nationwide failed to disclose Mr. Balcarcel's lawsuit, not that it affirmatively misrepresented its existence.[120] As such, Plaintiffs are required to establish that Nationwide had a

---

[115] *See generally* 28 N.Y. Prac., Contract Law § 5:5, Fraud in the inducement ("A claim of fraud in the inducement is premised upon one party making a misrepresentation that induces the other party to enter into a contract."); *id.* § 5:18. Failure to disclose—Fraudulent concealment ("A party claiming fraudulent concealment contends there has been a fraud because the other party failed to discharge a duty to disclose material information.").

[116] *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

[117] *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (citations omitted).

[118] Compl. at 7.

[119] MSJ Memo at 25.

[120] Indeed, Ms. Prescott never inquired as to whether any lawsuit was filed by Mr. Balcarcel, so there was no opportunity for Nationwide to falsely represent that such a lawsuit did not exist.
The Court notes that certain sections of Plaintiffs' Complaint do attempt to cast the concealment of the lawsuit as a misrepresentation. *See* Compl. ¶¶ 19 ("Nationwide deliberately misled Ms. Prescott with material misrepresentations to the effect that Mr. Balcarcel had simply decided that he wanted to pursue other interests."), 22 ("Nationwide continued to conceal the entire Balcarcel/Nationwide adversarial situation, fraudulently representing the transaction as a routine transfer of business."). Leaving aside Plaintiffs' lack of support for these assertions on summary judgment, a mere representation that the

duty to disclose Mr. Balcarcel's lawsuit, in addition to meeting the other four elements of common law fraud.

Nationwide argues that Plaintiffs have not satisfied several of these elements.[121] For the reasons discussed below, the Court finds that Nationwide's nondisclosure of Mr. Balcarcel's lawsuit was not a material omission, and, in any event, Nationwide had no duty to disclose the lawsuit.[122]

### (iii)    *Nationwide Made No Material Omission*

No reasonable juror could find that Nationwide's failure to disclose Mr. Balcarcel's lawsuit was a material omission. "Not every misrepresentation or omission rises to the level of fraud. An omission or misrepresentation may be so trifling as to be legally inconsequential."[123] Although the materiality of an omission is generally a fact-intensive inquiry that is best left to the factfinder, omitted facts may be immaterial as a matter of law when they "are so obviously unimportant to a reasonable [party] that reasonable minds could not differ on the question of their importance."[124]

There is no dispute that the dispute underlying Mr. Balcarcel's lawsuit was the effect that the 2007 coastal restrictions would have on the value of the servicing rights.[125] There is also no

---

circumstances of a transaction are "routine" or "normal" in some unspecified way is insufficient to turn a claim of fraudulent concealment into a claim of fraud in the inducement based on an affirmative misrepresentation.

[121] *See* MSJ Memo at 18–26.

[122] The Court assumes without deciding that Plaintiffs have raised triable issues of fact regarding the elements of justifiable reliance and injury.

[123] *Passiglia v. Northwell Health, Inc.*, 252 F. Supp. 3d 129, 137 (E.D.N.Y. 2017) (quoting *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 350, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999)) (alterations, internal quotation marks, and other citation omitted).

[124] *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 646 (S.D.N.Y. 2017) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)); *see also, generally, I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 544 (S.D.N.Y. 2017) ("Courts in the Second Circuit have found that the elements of common law fraud are essentially the same as those that must be pleaded to establish a claim under Section 10(b) and Rule 10b–5.") (internal quotation marks and citations omitted).

[125] Reply SOF Nos. 5–7.

dispute that Ms. Prescott was aware of the coastal restrictions at the time she signed the interim and permanent servicing agreements.[126] And Plaintiffs make clear that their claim in this action is not based on the imposition of the coastal restrictions or on any other issue taken up by Mr. Balcarcel in his lawsuit.[127] The obvious question, then, is why having been aware of Mr. Balcarcel's unrelated lawsuit would have affected a reasonable agent's decision to enter into the servicing agreement.

Plaintiffs' answer is merely to repeatedly assert that Ms. Prescott would not have entered into the servicing agreement if she had known of Mr. Balcarcel's lawsuit.[128] By and large, these assertions are wholly conclusory, and thus insufficient to create a triable issue of fact.[129] Plaintiffs' only attempt to extrapolate on this assertion is to suggest that it is "a matter of common sense[] that neither Ms. Prescott nor any other Nationwide agent would agree to buy an operation embroiled in major litigation when there are always trouble free agencies available."[130] Not only have Plaintiffs failed to put forth actual evidence that there were other "trouble free agencies"

---

Nationwide's Reply Statement of Fact No. 6, which is undisputed by Plaintiffs, states that the allegations levied by Mr. Balcarcel were "in large part" related to the coastal restrictions. Upon the Court's review of Mr. Balcarcel's Complaint, which was the only document filed before the settlement of the case that addressed the merits of his claim, the concealment of the coastal restrictions appears to be the *only* issue taken up in that case. In any event, if there were other issues raised in that lawsuit that Plaintiffs claimed were material to Ms. Prescott's decision to enter into the servicing agreement, Plaintiffs would be required to explain what those issues are and how they are relevant. They have not done so.

[126] Reply SOF No. 10.

[127] Opp'n at 15 ("Mr. Balcarcel claimed that Nationwide concealed upcoming Coastal Restrictions when he purchased the Brooklyn operation. Ms. Prescott makes no such claim—she was aware of the coastal restrictions . . . . Ms. Prescott's claim does not resemble Mr. Balcarcel's claims and would not depend, in any way, on the outcome of the *Balcarcel* litigation.").

[128] *Id.* at 4 ("Ms. Prescott states, unequivocally, that if Nationwide had disclosed the circumstances of Mr. Balcarcel's departure, she would not have simply become aware of some 'issues' or 'allegations.' She would have flatly refused to proceed with a purchase. Period. That is uncontested in the record."); *see also id.* at 13–14, 22 (repeating the same assertion in conclusory fashion).

[129] *Johnson v. Fordham Univ.*, No. 11-CV-4670 (ALC), 2016 WL 450424, at *3 (S.D.N.Y. Feb. 4, 2016) ("[S]elf-serving and conclusory affirmations, without more, are insufficient to create a triable issue of fact for the purpose of defeating summary judgment[.]") (citing *BellSouth Telecomms., Inc. v. W.R. Grace & Co. Conn.*, 77 F.3d 603, 615 (2d Cir. 1996)).

[130] Opp'n at 4.

available for Ms. Prescott to service, but Plaintiffs' "common sense" proposition is clearly incorrect. The premise of this argument is that *any* lawsuit filed against Nationwide relating to the Brooklyn policies would be per se material to an agent entering into a servicing agreement covering those policies. That is an untenable position. A lawsuit might not only be irrelevant to the agent's own situation, as is the case here, but it may be factually or legally frivolous, as in many other cases.[131] Simply put, the filing of a lawsuit is not by itself material. The substance of the allegations contained in a lawsuit may be material, but the inclusion of otherwise immaterial facts in a lawsuit does not make those facts, or the lawsuit itself, material.

Here, Plaintiffs have provided no substantive explanation as to why Mr. Balcarcel's lawsuit challenging the concealment of the enactment of coastal restrictions would have mattered to Ms. Prescott, who already knew about the coastal restrictions. Indeed, as discussed, Plaintiffs *explicitly disavow* the materiality of the substance of the fraud alleged by Mr. Balcarcel (both in his lawsuit and in his disputes with Nationwide that led to the lawsuit).[132] Instead, they attempt to bootstrap their new claim of redlining by Nationwide to their original claim that the nondisclosure of Mr. Balcarcel's lawsuit constituted fraud.[133] Because there is no dispute that Ms. Prescott knew the information that Mr. Balcarcel's lawsuit claimed was fraudulently concealed from him, the fact that Nationwide did not disclose the existence of the lawsuit itself is an omission that is "so trifling as to be legally inconsequential."[134] Nationwide has thus shown, as a matter of law, that its nondisclosure of the lawsuit was immaterial.[135]

---

[131] *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 310 (3d Cir. 2011) (en banc) ("We need not take judicial notice of the fact that plaintiffs with non-viable claims do nonetheless commence legal action.").

[132] *Opp'n* at 2.

[133] *Id.* at 16–22.

[134] *Gaidon*, 94 N.Y.2d at 350.

[135] In their Complaint, Plaintiffs suggested an additional reason that the filing of the lawsuit would have been material to Ms. Prescott, alleging that "the record in the litigation contained Nationwide's own internal projection in 2007 that showed a non-viable declining business." Compl. ¶ 31. As Nationwide points out in

(iv)    *Nationwide Had No Duty to Disclose Mr. Balcarcel's Litigation*

Nationwide has also shown, as a matter of law, that it did not have a duty to disclose Mr. Balcarcel's litigation or any of his pre-litigation disputes with the company. Even if a party fails to disclose a material fact in the course of a transaction, it will not be liable for fraudulent concealment unless it had a duty to disclose that fact.[136] Normally, a duty to disclose exists when there is a relationship of trust and confidence, such as a fiduciary relationship, between the parties.[137] Absent any such relationship, a duty to disclose may still exist, pursuant to the "special facts doctrine," where "one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair."[138]

Plaintiffs assert for the first time in opposition to summary judgment that they were in a relationship of trust and confidence with Nationwide.[139] By not making this assertion prior, Plaintiffs have forfeited it.[140] Moreover, Plaintiffs' assertion of such a relationship is merely

---

its Motion for Summary Judgment, however, Ms. Prescott testified that she has not seen this document and does not have it in her possession. MSJ Memo at 12 (citing Prescott Depo. at 37:3–37:16). In opposing summary judgment, Plaintiffs have neither produced this document nor responded to Nationwide's claim that Ms. Prescott does not have it. This alleged basis for the materiality of the lawsuit, then, is not sufficient to prevent summary judgment against Plaintiffs. *See Hernandez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234 (BMC), 2013 WL 6388654, at *3 (E.D.N.Y. Dec. 6, 2013) (holding that "unsupported allegations in a complaint" are not properly considered on summary judgment).

[136] *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) (citation omitted).

[137] *See Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 499 (S.D.N.Y. 2004) (citing *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002)).

[138] *Id.* (quoting *P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 378, 754 N.Y.S.2d 245, 252 (1st Dep't 2003)). Establishing a duty to disclose under the "special facts doctrine" also "requires satisfaction of a two-prong test: that the material fact was information peculiarly within the knowledge of defendant, and that the information was not such that could have been discovered by plaintiff through the exercise of ordinary intelligence." *Kriss v. Bayrock Grp. LLC*, No. 10-CV-3959 (LGS) (DCF), 2017 WL 1901966, at *2 (S.D.N.Y. May 8, 2017) (quoting *Jana L. v. W. 129th St. Realty Corp.*, 802 N.Y.S.2d 132, 135 (1st Dep't 2005) (internal quotation marks and alterations omitted)). However, because the Court finds that the allegedly concealed facts here were not "essential" and that their omission did not render the transaction "inherently unfair," the Court need not apply this test.

[139] Opp'n at 5–6.

[140] *Bush*, 452 F. Supp. 2d at 406–07.

conclusory, and "a conclusory allegation that the parties 'developed a relationship of trust and confidence apart from their contractual relationship' [] is insufficient" to survive a motion for summary judgment.[141]

Plaintiffs also fail to satisfy the "special facts doctrine." As the Court has discussed, Mr. Balcarcel's lawsuit is immaterial to Plaintiffs as a matter of law. Even if this omission were material, the standard for establishing a duty to disclose under the special facts doctrine is higher. Plaintiffs would not just have to prove that Mr. Balcarcel's lawsuit is material, but an "essential fact[]," the nondisclosure of which made the transaction "inherently unfair."[142] The record makes clear they cannot do so.

Because Nationwide has shown, as a matter of law, that the omission of Mr. Balcarcel's lawsuit was immaterial and that Nationwide had no duty to disclose the lawsuit, no reasonable juror could rule in favor of Plaintiffs on the merits of their fraud claim. The Court thus recommends granting Nationwide's Motion for Summary Judgment.[143]

## II.    Motion for Sanctions

Nationwide has also moved for sanctions against Plaintiffs and Plaintiffs' counsel pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent authority to sanction a party or attorney who has committed a fraud on the court.[144] Nationwide asks the District Court to dismiss Plaintiff's Complaint, with prejudice; hold Plaintiffs and their

---

[141] *Barbara v. MarineMax, Inc.*, No. 12-CV-368 (ARR), 2012 WL 6025604, at *11 (E.D.N.Y. Dec. 4, 2012) (collecting cases).

[142] *Travelers Indem. Co. of Illinois*, 322 F. Supp. 2d at 499.

[143] Having determined that Nationwide is entitled to summary judgment on the merits of Plaintiffs' claims, the Court need not address Nationwide's argument that Plaintiffs' complaint fails to plead fraud with particularity. *See* MSJ Memo at 26–27.

[144] *See* Mot. Sanctions; *see also* Plaintiffs' Memorandum in Opposition to Sanctions ("Sanctions Opp'n"), ECF No. 35-5, Defendant's Reply Memorandum in Support of Sanctions ("Sanctions Reply"), ECF No. 35-7.

counsel jointly and severally liable for all of Nationwide's attorney's fees incurred in defending itself in this action; and grant any other relief deemed proper.[145]

A. *Standards*

Sanctions under Federal Rule of Civil Procedure 11 may be warranted when an attorney, law firm, or party has demonstrated "objective unreasonableness."[146]

> A pleading, motion or other paper violates Rule 11 either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.[147]

The decision of whether to impose sanctions is "committed to the district court's discretion."[148]

Additionally, 28 U.S.C. § 1927 "allows a court to require an attorney 'who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'"[149] "To impose sanctions under § 1927, a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay."[150] "A court may infer bad faith when a party undertakes frivolous actions that are 'completely without merit.'"[151]

---

[145] Mot. Sanctions at 26.

[146] *Toussaint v. NY Dialysis Servs.*, 230 F. Supp. 3d 198, 221–22 (S.D.N.Y. 2017) (quoting *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000)); *see also* Fed. R. Civ. P. 11(c) (granting district court authority to "impose an appropriate sanction on any attorney, law firm, or party" that has run afoul of the Rule).

[147] *Ferguson v. Comm'r of Tax & Fin.*, 739 F. App'x 19, 21–22 (2d Cir. 2018) (quoting *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002)).

[148] *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004) (citations omitted).

[149] *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 55 (2d Cir. 2018) (quoting 28 U.S.C. § 1927 (alteration in original)), *cert. denied*, 139 S. Ct. 1282, 203 L. Ed. 2d 280 (2019).

[150] *Id.* (quoting *Kim v. Kimm*, 884 F.3d 98, 106 (2d Cir. 2018)) (brackets omitted).

[151] *Id.* (quoting *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000)).

"The inherent powers of the Court also allow it to sanction parties and attorneys who have 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[152] Sanctioning a party or attorney for committing a fraud on the court may be appropriate where the court finds "by clear and convincing evidence, that the party or attorney knowingly submitted a materially false or misleading pleading, or knowingly failed to correct false statements, as part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly."[153]

B. *Nationwide's Arguments*

By and large, the basis for Nationwide's Motion for Sanctions is that Plaintiffs filed and refused to voluntarily dismiss this case despite what Nationwide argues is overwhelming evidence against it. In the Court's view, arguments to this effect are unavailing. Nationwide has not met its burden on the statute of limitations, so the fact that Plaintiffs opposed those arguments is not a basis for sanctions against them. The Court agrees with Nationwide that Plaintiffs' fraudulent concealment claim is meritless. The Court also agrees that Plaintiffs' attempt to shift the basis of their claim to Nationwide's alleged redlining is particularly silly in light of the basic principle that arguments cannot be introduced for the first time in opposition to summary judgment. But, although a somewhat close question, the Court does not find that Plaintiffs' refusal to withdraw their meritless case warrants sanctions. For one, the weakness of Plaintiffs' arguments on the merits rendered the claims relatively straightforward to dispose of at the summary judgment stage.[154] More importantly, the Court does not perceive that Plaintiffs are motivated by an

---

[152] *Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 339 (S.D.N.Y. 2019) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975)), *reconsideration denied*, No. 16-CV-5439 (JPO), 2019 WL 2992043 (S.D.N.Y. July 9, 2019).

[153] *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 427 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).

[154] *See Blanch v. Koons*, 485 F. Supp. 2d 516, 518 (S.D.N.Y. 2007) (sanctions were not warranted where simple application of law disposed of case).

improper purpose in refusing to withdraw their arguments on the merits, even if the arguments are weak.

Besides this, Nationwide argues that the conduct of Plaintiffs and Plaintiffs' counsel during discovery, particularly their belated disclosure of the May 28, 2008 e-mail, warrants sanctions. As noted, Ms. Prescott maintained that she had never reviewed the e-mail, up to and including when Nationwide presented it at her deposition, at which she accused Nationwide of having doctored the e-mail. However, on July 25, 2018, two days after her deposition, she forwarded the e-mail to her counsel Mr. Tedards.[155] As it turns out, this e-mail was among the active e-mails of her still current Nationwide address and remained in the folder "Brooklyn opp."[156] Roughly six weeks after Ms. Prescott forwarded the e-mail to Mr. Tedards, Plaintiffs still had not corrected their prior representations that the e-mail did not exist, nor had they provided the e-mail as a supplemental discovery response.[157] On September 14, 2018, Nationwide served requests for admissions calculated to force Plaintiffs to admit that they had received the e-mail.[158] On October 13, 2018, Plaintiffs admitted that they received the e-mail.[159] On October 22, 2018, Nationwide's counsel served Plaintiffs and their counsel with a Rule 11 safe harbor letter, prominently raising the issue of the e-mail.[160]

In response, Ms. Prescott has submitted a declaration regarding her search of her e-mails during discovery.[161] She avers that she searched her e-mails to respond to Nationwide's initial discovery requests, but that she was unable to retrieve any e-mails that were sent earlier than

---

[155] Mot. Sanctions at 8–9; Declaration of Joseph A. Brown ("Brown Decl.") ¶¶ 15–17, ECF No. 35-3.
[156] Mot. Sanctions at 9; Brown Decl. ¶ 15.
[157] Mot. Sanctions at 9.
[158] *Id.*; Declaration of Ali Haque, Esq. ("Haque Decl.") ¶ 8, ECF No. 35-2; Exh. 7 to Haque Decl., ECF No. 35-2 at 37.
[159] Mot. Sanctions at 9; Exh. 8 to Haque Decl., ECF No. 35-2 at 47.
[160] Mot. Sanctions at 10; Exh. 9 to Haque Decl., ECF No. 35-2 at 65–68.
[161] Declaration of Jo Ann Prescott ("Prescott Decl."), ECF No. 35-6.

2016.[162] She says that she believed that this may have been due to Nationwide's implementation of a new e-mail client in 2017.[163] However, there is no indication in the record that she explained this apparent technical obstacle to recovering potential responsive discovery to Nationwide, nor that she sought to remedy the technical difficulty until February of 2019, when she raised the issue with a member of Nationwide's IT department.[164]

In the Court's view, this conduct is borderline, but does not warrant sanctions beyond dismissal of the case with prejudice. Although the Court does not agree that the May 28, 2008 e-mail is the smoking gun that Nationwide claims, it is certainly relevant discovery that Plaintiffs should have turned over. The fact that Ms. Prescott, after performing a universal search that only revealed e-mails from 2016 and later, did not simply click on the folders where her e-mails were located appears difficult to justify. The same goes for Ms. Prescott's failure to affirmatively correct her deposition testimony that she did not receive the e-mail until three months later in response to Nationwide's request for admission. Given his obligation to supervise his client's role in discovery, Mr. Tedards also shares blame for these deficiencies.

However, these deficiencies are not sufficiently extreme to warrant sanctions beyond dismissal. Nationwide's most forceful argument is that in not disclosing her receipt of the e-mail until Nationwide submitted a request for admission, Plaintiffs committed a fraud on the court.[165] Literally, Plaintiffs can be said to have "knowingly failed to correct [a] false statement[]"[166] by not revealing that Ms. Prescott did in fact have access to the e-mail once she forwarded to counsel. However, there is not "clear and convincing evidence" that this failure was "part of a deliberate

---

[162] *Id.* ¶¶ 12–17
[163] *Id.*
[164] *Id.* ¶¶ 27–29.
[165] Sanctions Reply at 2–3.
[166] *Almeciga*, 185 F. Supp. 3d at 427.

- 33 -

and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly."[167] Plaintiffs' delay could be explained by laxness as easily as by actual bad faith. In any event, Plaintiffs did ultimately correct the false statement the first time that Nationwide raised the issue. This is not a clear example of a fraud on the court.

The Court also does not find clear evidence that Plaintiffs' breaches of their discovery obligations significantly multiplied the proceedings in this action. Nationwide had all of Ms. Prescott's e-mails, regardless of whether she turned them over.[168] On summary judgment, Nationwide would easily have been able to show that she had in fact received the e-mail, even if she had maintained that she had not. And, contrary to Nationwide's assertions that the e-mail is obviously dispositive, the filing of its Motion for Summary Judgment was necessary to obtain the dismissal of Plaintiffs' claims, regardless of Ms. Prescott's admission that she received the e-mail. Although Plaintiffs' performance of their discovery obligations appears to have been somewhat deficient, it did not cause any clear prejudice to Nationwide.[169] Thus, the Court finds that sanctions beyond dismissal are not warranted in this case.

---

[167] *Id.*

[168] Nationwide asserts that it had to undertake "a costly and time-consuming forensic analysis" to determine whether Ms. Prescott had actually received the May 28, 2008 e-mail. Mot. Sanctions at 8. In support of this assertion, Nationwide has submitted the declaration of Joseph A. Brown, a Senior Consultant in the Nationwide's Information Risk Management, Security Command Center. *See* Brown Decl. Mr. Brown's declaration suggests that the "investigation" into whether Ms. Prescott received the e-mail in 2008 and/or still had access to the e-mail during this litigation consisted of reviewing a few discrete items of metadata to which Nationwide already had access. *Id.* ¶¶ 5–18. Contrary to Nationwide's counsel's claims, it seems unlikely that this investigation required Nationwide to expend substantial resources.

[169] In addition to requesting sanctions based on the belated disclosure of the e-mail, Nationwide states that on November 19, 2018, after the close of discovery, Ms. Prescott "provided over 300 pages of documents and emails to Nationwide." Mot. Sanctions at 3. Nationwide claims that these documents "directly contradicted her prior statements and testimony that the[se documents] had been deleted," *id.*, and that "many of the[m] were key documents related to the litigation, mostly from 2008 or 2011," *id.* at 11. However, Nationwide has not explained what these 300 documents are or why their belated disclosure warrants sanctions. *See* Haque Decl. ¶ 14, ECF No. 35-2 (merely claiming that 300 documents were produced after the close of discovery).

**CONCLUSION**

For the reasons set forth above, the Court recommends granting Defendant's Motion for Summary Judgment and dismissing the case with prejudice. The Court recommends denying Defendant's Motion for Sanctions.

**OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir. 2002); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Thomas v. Arn*, 474 U.S. 140 (1985). Responses to any objections shall be due fourteen (14) days from service of the objection. *See* Fed. R. Civ. P. 72(b)(2).


**SO ORDERED.**

                                                  /s/ Steven L. Tiscione
                                                  Steven L. Tiscione
                                                  United States Magistrate Judge
                                                  Eastern District of New York


Dated: Brooklyn, New York
       August 27, 2019

- 35 -